

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 21, 2023**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| Joseph F. Langston, Jr. | § | |
| | § | Case No. 19-33022-SGJ-7 |
| Debtor. | § | |
| | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER SUSTAINING OBJECTION TO DEBTOR'S
EXEMPTION OF INDIVIDUAL RETIREMENT ACCOUNTS**

## I.    INTRODUCTION.

In this contested matter, the above-referenced chapter 7 debtor has sought to exempt two

self-directed individual retirement accounts ("IRAs"): (a) a Roth IRA, and (b) a traditional/SEP

1

IRA (collectively, the "Debtor's IRAs").  The Debtor's IRAs were established in a somewhat atypical structure—at least atypical from what this court has seen over the years.  Specifically, the Debtor's IRAs are administered within the vehicle of a Texas limited liability company ("LLC") known as Ola Investments, LLC ("Ola").  Ola is solely managed by the Debtor. And the money in the Debtor's IRAs has been pooled and commingled into a common fund owned by Ola, along with money deposited into a traditional IRA belonging to the Debtor's non-debtor wife, Lujan Langston ("Spouse's IRA").

A prepetition judgment creditor of the Debtor known as Dallas Commodity Company ("Creditor" or sometimes "Dallas Commodity") has objected to the exemption of the Debtor's IRAs—not based on this atypical structure *per se* but—rather—based on the Debtor's rather unfettered disbursing and depositing of monies into and out of Ola in recent years to and from various business entities owned and managed by the Debtor.  Specifically, Creditor argues that the Debtor engaged in one or more "prohibited transactions" under the Internal Revenue Code, 26 U.S.C. § 4975(c), by "lending money" or making "other extension of credit between a plan and a disqualified person" or by "transfer[ing] to, or us[ing] by or for the benefit of, a disqualified person ... the income or assets of the plan."

As a result, Creditor argues that each of the Debtor's IRAs has ceased to maintain their status as qualified IRAs, pursuant to 26 U.S.C. § 408(e)(2), and, thus, constitute nonexempt property of the Debtor's bankruptcy estate that should be available for creditors. Creditor asks for this court to sustain its objections; declare that all sums held by Ola are property of the estate; and order the Debtor to account for and turnover to the bankruptcy estate all sums that were held by Ola as of the bankruptcy petition date (approximately $500,000).

The Debtor essentially concedes that there was frequent transferring of funds in and out of his IRAs in recent years, from Ola to his various business entities, and then back again to Ola (although the exact amount is somewhat in dispute). The Debtor now takes the position that all amounts withdrawn were mere "distributions" to him from his IRA and all amounts deposited back into Ola were "excess contributions" by him (despite having sworn dozens of times earlier in this Bankruptcy Case that "loans" were being made to his business entities by Ola and repaid by them to Ola). The Debtor says he was confused in calling the transfers "loans." He further argues that, since he (and his spouse) have been above the age of 59½ at all relevant times (which is a milestone age at which an individual may withdraw from retirement funds without a tax penalty), that the amount of his "distributions" and "excess contributions" are irrelevant. In his view, he could withdraw as much as he wanted, unfettered, and also could contribute back to his IRAs whenever he wanted. While there might be a tax consequence here and there, he argues there is no impact on the qualification or exempt-status of his IRAs.

An evidentiary hearing on this contested matter was held on February 27, 2023, and April 26, 2023 (the "Trial"). The court heard from two witnesses, the Debtor and a Certified Public Accountant ("CPA") offered by the Debtor. The court was presented with 75 exhibits. The court thereafter entered an order requiring post-Trial briefing on certain questions. Post-Trial briefing was submitted on May 26 & 30, 2023. Having reviewed the evidence and the parties' briefs, this court finds that the Debtor's IRAs are ***not*** exempt and, therefore, constitute property of the bankruptcy estate subject to turnover. This Memorandum Opinion and Order constitutes the court's Findings of Fact and Conclusions of Law in support of its decision, pursuant to Fed. R. Bankr. Pro. 7052. Any Finding of Fact that should more properly be characterized as a Conclusion of Law should be deemed as such, and *vice versa*.

3

## II.    FINDINGS OF FACT.

1.      The above-referenced chapter 7 bankruptcy case ("Bankruptcy Case") was filed on September 6, 2019 ("Petition Date"), by Joseph F. Langston, Jr. (the "Debtor"). Daniel Sherman was appointed as the Chapter 7 Trustee. The Debtor is currently 71 years of age.  He is a CPA in "retired status"[1] and has been involved in oil and gas investments and other investments in recent years.  The Debtor received a discharge on March 9, 2022.

2.      Prior to the Bankruptcy Case, on March 17, 2014, Creditor filed Cause No. 2014 L 3112, *Dallas Commodity Co. et al v. The Langston Family Limited Partnership et al*, against the Debtor and Langston Family Limited Partnership (the "Langston LP") in the Circuit Court of Cook County, Illinois, where the Chicago Mercantile Exchange is located.  Langston LP, of which the Debtor is general partner,[2] had lost substantial amounts of money trading commodities and there was a large deficit which the Debtor had personally guaranteed.

3.      In February of 2018, a jury rendered a verdict, and on February 19, 2019, a judgment was entered favor of the Creditor in the amount of $1,516,647.01, plus post-judgment interest thereon.  The judgment was against both the Debtor and Langston LP.

4.      The Debtor put Langston LP in a separate involuntary chapter 7 bankruptcy case in this District on September 9, 2019—just three days after the Debtor filed his own personal case.

5.      In this Bankruptcy Case, the Debtor opted to claim exemptions under Texas state law, as set forth in chapter 42 of the Texas Property Code. On September 1, 2020, the Debtor filed a First Amended Schedule A/B listing the following property:

---

[1] Doc. 126, Hearing Transcript – April 26, 57:20-58:1. References to filings of record in this Bankruptcy Case are denoted herein as "[Doc. __]."

[2] According to tax returns submitted into evidence, Langston LP was owned 40% by the Debtor, 40% by the Debtor's Spouse, and 20% by their daughter.  Creditor Exh. 38 (tax returns for Langston, LP).  According to the original limited partnership agreement submitted into evidence, Langston LP was owned 46.5% by the Debtor, 45.5% by the Debtor's Spouse, and 8% by their daughter.  Creditor Exh. 46, Sec. 4.1.

(a) an IRA valued at $318,717.14 maintained by Ola, and

(b) another IRA valued at $250,907.13 also maintained by Ola.[3]

6.      The Debtor refers to Ola—again, which is an LLC—as a "managed retirement account."[4] A CPA witness for the Debtor referred to Ola as a "self-directed IRA where the members are individual retirement accounts held by a Trustee and then the LCC holds those funds and makes investments on behalf of the IRAs."[5]

7.      The Debtor purports to be the sole manager of Ola. Ola's only members are purported to be three IRAs: Joseph F. Langston, Roth IRA; Joseph F. Langston SEP (a traditional IRA);[6] and Lujan Couch/SEP, a "sub-IRA" for the Debtor's Spouse (collectively, the "Three IRAs").

8.      The Debtor represents that all Three IRAs that comprise Ola's assets are, in turn, "held by a trustee named Forge Trust."[7] Ola has a checking account at American National Bank and a financial account at TD Ameritrade.

9.      The LLC agreement (i.e., operating agreement) governing Ola was admitted into evidence.[8] It is rather inexpertly drafted—likely based on a form to which a nonlawyer might have gained access. There was no testimony at Trial as to whom might have drafted it. It reflects that it was made on July 26, 2011, among "IRA Services Trust Company" (with an address in San

---

[3] Debtor Exh. A.
[4] Doc. 115, Hearing Transcript – February 27, 41:12
[5] Doc. 115, Hearing Transcript – February 27, 121:11-15.
[6] The court takes judicial notice that "SEP" stands for "Simplified Employee Pension Plan" and is referred to as a traditional IRA. The court takes judicial notice that a "Roth IRA" is an IRA but is distinguishable from a traditional one in that contributions to it are not tax deductible, but qualified distributions may be tax free. The various differences are described at irs.gov, search "Traditional and Roth IRAs." A Roth IRA "consists of funds that have been specifically contributed to that account on an after-tax basis, meaning that taxes have already been paid on those funds. The nature of a Roth IRA is that so long as the rules are followed, and distributions are made after age 59½, that the original funds and any growth on those funds are distributed to the owner of that account on a tax-free basis." Doc. 115, Hearing Transcript – February 27, 122:5-11.
[7] Doc. 115, Hearing Transcript – February 27, 41:22-24.
[8] Debtor Exh. E.

Carlos, California)[9] and the "Members" (which are referred to as the "IRA Accounts" listed on an

Appendix B.[10]   The Ola operating agreement indicates that the "Manager" of Ola "shall be Joseph

Langston IRA 250211, and that Joseph Langston shall serve as the authorized representative of

the members until and unless an alternate representative is designated."[11]   It stated that "[a]ll

distributions shall be made at the discretion of the Manager."[12]   The Ola operating agreement has

a section entitled "Capital Contributions and Distributions" that provides that "*[a]dditional capital

contributions to the Limited Liability Company after the initial capital contribution may be made

only when accompanied by a licensed attorney's Opinion Letter citing authority for the addition

of capital to the Limited Liability Company from the client's Individual Retirement Account*"

(and reciting other details that must be in any such Opinion Letter).[13]   It further stated that lending

was prohibited between the IRAs and a "disqualified person" (the definition of "disqualified

person" is on page 11 of Debtor's Exhibit E—with several examples—and it would appear to

encompass the Debtor at least in his capacity as "an officer, director (or individual having powers

or responsibilities similar to those of officers or directors") of Ola, and also in his capacity as a

fiduciary to Ola (as well as his family members).[14]   The Debtor's CPA testified that the Debtor,

his wife, and his daughter would all be "disqualified persons."[15]

     A. *The Debtor's Recent Cash Usage Habits*.

     10.    In recent years prepetition, the Debtor has not had any personal bank accounts.[16]

---

[9] Apparently, this was the former name of Forge Trust. Doc. 126, Hearing Transcript – Apr. 26, 36:5-6.
[10] *Id.* at pp. 1, 13, & 14.
[11] *Id.* at 1. The Debtor is also named as Ola's Registered Agent. *Id.* at 2.
[12] *Id.* at 3.
[13] *Id.* (emphasis added).
[14] *Id.* at 11-12.
[15] Doc. 126, Hearing Transcript –Apr. 26, 142:1-5. The court notes that the definition of "disqualified person" in the Ola operating agreement is slightly narrower than the definition in the Internal Revenue Code (the latter of which is discussed later in the Conclusions of Law section).
[16] Doc. 126, Hearing Transcript –Apr. 26, 58:19-59:4.

11.     Rather, the aforementioned family-owned partnership known as Langston LP (as noted above, now also a chapter 7 debtor) had a bank account at American National Bank, and this is what the Debtor typically used for his business and personal needs up until April 2018.[17]

12.     However, beginning in April 2018, just after the jury verdict in Chicago against the Debtor and Langston LP, the Debtor opened a new bank account for an entity called Langston Investments, Inc., also at American National Bank, and transferred the money from the Langston LP account into the new Langston Investments, Inc. account and began doing all banking (for business and personal needs) through this new account. Langston Investments, Inc. had previously been owned 50% by the Debtor and 50% by Langston LP, but new shares were issued in March 2018, changing its ownership allocation as follows:  19% was owned by Debtor; 1% by Langston, LP; 40% by Debtor's Spouse; and 40% by Debtor's daughter.[18]  The Debtor testified that he is the managing member of Langston Investments, Inc. Langston Investments, Inc. is an S-corporation.[19]

13.     This is where things get thorny.  As alluded to earlier, the Debtor was the Manager of Ola.  Prior to filing bankruptcy—specifically, at least from December 14, 2015, through April 2, 2018—the Debtor initiated numerous transfers of funds in and out of Ola to and from the Langston LP bank account.  After April 2018, the same thing happened—only it was to and from the Langston Investments, Inc. bank account. It was this transfer activity that was the impetus for the exemption objection that is now before the court.

14.     Specifically, during late 2015 through March 2018, it appears that close to $290,000 was transferred out of Ola's commingled funds (consisting of the pooled deposits of the Three

---

[17] Doc. 115, Hearing Transcript – February 27, 78:1-24.
[18] Doc. 126, Hearing Transcript – April 26, 56: 20-21; 137:20-23; Doc. 115, Hearing Transcript – February 27, 15:1-13; 41:2-4; 70:17-72:11. *See also* Debtor Exh. A (Schedule A/B, Q. 19).
[19] Doc. 126, Hearing Transcript – April 26, 56:20-21.

IRAs) to Langston LP's checking account.[20]  Langston LP, in turn, used the funds to pay both business expenses and personal expenses of the Debtor and his family.  Additionally, several thousands of dollars of more transfers were made from April 2018 through November 2019 from Ola to Langston Investments, Inc., which also had a checking account which the Debtor also used for both business and personal needs and expenses.[21] As far as the personal expenses, this included paying the Debtor's own personal credit card bills, property taxes on his home, paying for gifts to his family members, and making tens of thousands of dollars of charitable contributions to Landmark Church of Christ (of which he is a corporate officer).[22]

15.    To recap, it is undisputed that large amounts of funds were disbursed from the Three IRAs to the Debtor's family-owned businesses, Langston LP and Langston Investments, Inc.  Langston LP and Langston Investments both had accounts which were then used by the Debtor for personal and business expenditures.  The Debtor had no personal checking or bank account in his personal name. Ola (directly or indirectly through Langston LP) also made disbursements in the past to still two more entities of which the Debtor was a 50% owner: one entity called Melrose Minerals and another entity called TXX Energy.[23]

16.    ***Putting the correct label on all this transfer activity in and out of the Three IRAs (i.e., Ola) proves vexing***.  Sometimes amounts disbursed from Ola were repaid at least partially to Ola.[24]  The Debtor, at Trial, referred to these payments back to Ola as "excess contributions," but not repayments of loans, despite some evidence to the contrary.[25]

---

[20] Creditor Exh. 7, page LANGSTON 001273.  The Debtor stated at trial, that despite the information on Exhibits 7 & * (which he prepared showed transfers of funds) there were only $128,000 worth of disbursements (14 separate transfers).  Doc. 126, Hearing Transcript –Apr. 26, 110.
[21] Creditor Exh. 8, page LANGSTON 001069; Doc. 115, Hearing Transcript – February 27, 62:6-12.
[22] Doc. 115, Hearing Transcript – February 27, 77:24-79:3.
[23] Doc. 115, Hearing Transcript – February 27, 83:24-88:12.
[24] Creditor Exh. 7 (pp. LANGSTON 001272-001273) & Exh. 8 (LANGSTON pp. 001064 & 001069).
[25] Doc. 115, Hearing Transcript – February 27, 101:3-9.

17.    Specifically, during the Trial, the Debtor testified that the monies transferred from Ola to Langston LP and Langston Investments, Inc. were not loans but, rather, were "distributions."  He emphasizes the fact that there are no notes or other loan documents.  However, this Trial testimony was contrary to his earlier testimony at seven different section 341 first meetings of creditors in this case[26] and also in the separate Langston LP bankruptcy case.[27]  At those section 341 meetings, he repeatedly (perhaps as many as 90 times) referred to the transfer activity as loans.[28]  Moreover, his Trial testimony was contrary to his original Schedules filed in this Bankruptcy Case which stated at Question #53:  "Through his retirement account owned entity, Ola Investments, LLC, Debtor has claims against Langston Family Limited Partnership for loans made to that partnership over the last 4 years."[29]  It was also contrary to the original Schedules filed in the Langston LP case[30] and certain exhibits he prepared and shared during the Bankruptcy Case, all of which reflected the transfers as loans.[31]  In short, the Debtor previously swore on multiple occasions that lending in and out of the Debtor's IRAs was what was in substance happening.   Now he says it was distributions and contributions (albeit "excess" contributions).   As earlier noted, the Ola operating agreement has a section entitled "Capital Contributions and Distributions" that provides that "*[a]dditional capital contributions to the Limited Liability Company after the initial capital contribution may be made only when accompanied by a licensed attorney's Opinion Letter citing authority for the addition of capital to the Limited Liability Company from the client's Individual Retirement Account*" (and reciting other details that must be in any such Opinion Letter).   There was no evidence at Trial that the

---

[26] *See* Exhibits #47, #48, #49, #50, #51 & #52 (Transcripts from numerous section 341 meetings); *see also* Doc. 115, Hearing Transcript – February 27, 48:16-50:2.
[27] Doc. 115, Hearing Transcript – February 27, 67:1-24.
[28] Doc. 115, Hearing Transcript – February 27, 68:6-69:70:15; 75:9-24; 77:13-23; 116:1-117:5.
[29] Creditor Exh. 4, page LANGSTON 001161
[30] Doc. 115, Hearing Transcript – February 27, 63:1-64:11.
[31] Creditor's Exhs. 7 & 8.

Debtor or Ola ever obtained an Opinion Letter from an attorney regarding the alleged excess contributions the Debtor now testifies he or his family business entities made into Ola.

18.     The Debtor, without much explanation for his prior inconsistent testimony and documents presented to the bankruptcy court, claims that, since he and his wife were above age 59½ at the time of all disbursements out of Ola, that there was nothing problematic about them. Moreover, he was said he was simply confused earlier during his Bankruptcy Case in referring to the back-and-forth disbursement activity as lending.[32] This court did not find the Debtor's explanations for his inconsistent testimony particularly compelling or persuasive.  Notably, the Debtor testified that he formerly practiced as a CPA; thus, he is a person with some financial savvy.[33]

19.     The Debtor's tax returns submitted into evidence for years 2015, 2016, 2017, and 2018 did not disclose "distributions" from or "excess contributions" to the Debtor's IRAs.[34] In this regard, the Debtor testified that all monies withdrawn from Ola came from his ***Roth*** IRA—not the traditional IRA—so he had already been taxed on these monies at the time of their initial contribution to the Roth and he, consequently, did not have to report the distributions as taxable income on his tax returns.[35] However, the court was not presented with evidence to establish that the monies that had been withdrawn from Ola had come ***solely from the Roth.*** As noted previously, the Ola account contains monies from all Three IRAs in a pooled, commingled format.  Moreover, the Debtor's CPA testified that while a distribution from a Roth, "if other requirements are met, is not a taxable distribution[, t]he expectation would be that there should be a 1099-R reflecting that

---

[32] Doc. 115, Hearing Transcript – February 27, 102:5-7.
[33] The Debtor's CPA testified: Q. Is there a specific age that's important with respect to transactions, prohibited transactions? A. Not specifically with respect to prohibited transactions. The age requirements with respect to individual retirement accounts are more related to how those distributions might be taxed and whether or not contributions can be made to those accounts." Doc. 115, Hearing Transcript – February 27, 125:7-13.
[34] Creditor Exhs. 38-40.
[35] Doc. 115, Hearing Transcript – February 27, 68:22-23.

distribution. It would show up on the return but would not affect the taxable income of that return."[36]

20.     Moreover, the court was given no explanation for why excess contributions would not have been reported on the Debtor's tax returns and subjected to a significant surcharge. The Debtor's CPA testified that the maximum amount that an individual can contribute to an IRA on a yearly basis is "6,500 or $7,500" and if someone puts in more than that, it "would be deemed an excess contribution" and the taxpayer would have to withdraw the excess contribution from the IRA or "face a surtax" of 6% "assessed on those excess contributions."[37]

21.     In any event, the disbursements out of the Debtor's IRAs had to have been either "loans" or "distributions"—depending on which of the Debtor's testimony and other evidence is believed.

22.     Based on all the evidence presented at the Trial, it appears to this court that the transfers to and from the Ola account were not made in accordance with any sort of formulaic or deliberate plan or method; rather, it seems ***the Debtor repeatedly and sporadically withdrew funds from and redeposited them into the Ola account as needed*** in a haphazard and informal manner.

## III.     CONCLUSIONS OF LAW.

*A. Jurisdiction and Venue.*

1.     Bankruptcy subject matter jurisdiction exists in this contested matter pursuant to 28 U.S.C. § 1334.  This is a statutory core proceeding, pursuant to at least 28 U.S.C. § 157(b)(2)(B) and (E); thus, the bankruptcy court has statutory authority to enter a final order.

2.     To the extent there is any dispute regarding the core nature of the claims, the court deems the parties to have consented to final adjudication by the bankruptcy court.

---

[36] Doc. 115, Hearing Transcript – February 27, 126:20-23.
[37] Doc. 115, Hearing Transcript – February 27, 128:5-21.

3.      This court has determined that it has constitutional authority to enter a final order in this matter.

4.      Venue is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

*B.      Assertion of Exemption.*

5.      A bankruptcy filing creates an estate containing all legal and equitable interests of a debtor in property as of the commencement of the case, wherever located and by whomever held.[38] A debtor may exclude certain property as a source of payment to creditors by claiming an exemption as to the property.[39]

6.      Exemptions are to be construed liberally in favor of the debtor; a party objecting to a debtor's claim of exemptions "has the burden of proving that the exemptions are not properly claimed."[40]

7.      Here, the Debtor opted to take the Texas state law exemptions in his Bankruptcy Case.[41] Texas Property Code Sec. 42.0021 exempts a "qualified savings plan" (which includes both traditional IRAs and Roth IRAs) from creditors generally, to the extent the plan or account is exempt from federal income tax. Such accounts cannot be touched by creditors.

8.      The Bankruptcy Code does not independently define what is properly exempt as a retirement fund; rather, it simply defaults to the Internal Revenue Code.[42]  Exempt property, therefore, includes any retirement funds in an account that qualifies for favorable tax treatment under specified sections of the Internal Revenue Code.  In short, a "qualified" IRA equals a tax-exempt IRA, which equals a bankruptcy-exempt IRA.

---

[38] 11 U.S.C. § 541(a).
[39] 11 U.S.C. § 522(b).
[40] Fed. R. Bankr. P. 4003(c).
[41] 11 U.S.C. § 522(c)(A).
[42] *See* 11 U.S.C. § 522(b)(3)(C) & (4).

9.      The Internal Revenue Code sets out specific guidelines that must be followed in order for these accounts to maintain their tax-exempt (and thus, by extension, creditor-exempt) status.  For example, section 4975(c) of the Internal Revenue Code forbids certain actions that it terms "prohibited transactions."[43] Then, pursuant to 26 U.S.C. § 408(e)(2), the consequence of engaging in a "prohibited transaction" is loss of the exemption of the IRA.  Internal Revenue Code. 26 U.S.C. § 4975(c)(1), defines a "prohibited transaction" as follows:

> For purposes of this section, the term "prohibited transaction" means any direct or indirect –
>
> (A) sale or exchange or leasing of any property between a plan and a disqualified person;
>
> (B) *lending of money or other extension of credit between a plan and a disqualified person*;
>
> (C) furnishing of goods, services, of facilities between a plan and a disqualified person;
>
> (D) *transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;*
>
> (E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account; or
>
> (F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.[44]

10.      To be clear—and potentially relevant here—the statutory consequence of making loans between a plan and a "disqualified person," or of making transfers of assets or income from a plan to or for the benefit of a "disqualified person," is the loss of the IRA-exempt

---

[43] 26 U.S.C. § 4975(c).
[44] 26 U.S.C. § 4975(c) (emphasis added).

status under the Internal Revenue Code.[45] As this court noted above, the loss of IRA-exempt

status means the consequent loss of creditor-exempt status.

11.      Thus, here, the question posed is whether the Debtor's IRAs lost their exempt status

due to all of the transfer activity between Ola and Langston LP and Langston Investments, Inc.

This requires tackling two more specific questions:

a.   Did the monies that moved from Ola to the Langston entities, and back again to Ola,

constitute "prohibited transactions," either because they were loans to a "disqualified

person" or, alternatively, "transfers" to or for the benefit of a "disqualified person"?

b.   Does the fact that the Debtor and his wife were above the age of 59½ at the time of these

funds-flows and beneficiaries/participants in the IRA plans make what would otherwise

be "prohibited transactions" to "disqualified persons" entirely lawful distributions?

*(1) Were the payments from Ola and to the Langston Entities Loans?*

12.      Based on the testimony from numerous section 341 meetings,[46] certain

documentation prepared by the Debtor (Exhs. 7 & 8), as well as the Debtor's original sworn

Schedules, it is undeniable that the Debtor previously characterized these payments as loans on

numerous occasions. During the evidentiary hearings before the court, however, the Debtor was

adamant that these transactions were not, in fact, loans, and that he had previously been under the

wrong impression regarding their proper classification. The CPA witness put forward by the

Debtor also confirmed that upon a review of the Debtor's books and records, he had not found any

loan notes or other documentation to establish a debtor/creditor relationship between Ola and the

Langston entities.[47]

---

[45] 26 U.S.C. § 408(e)(2) (provides that if an individual engages in "prohibited transactions," an account ceases to be
an IRA as of the first day of the taxable year in which the individual engaged in the "prohibited transactions").
[46] Exhibits #47, #48, #49, #50, #51 & #52.
[47] Doc. 115, Hearing Transcript – February 27, 126:2-7.

13.    As the objector to the Debtor's exemptions, Dallas Commodity had the burden to establish by a preponderance of the evidence that these transactions were loans.[48] Given the evidence presented to this court, it appears ***more likely than not*** that the Debtor intended for the funds-flow to be in the nature of lending—each time intending for the lending to be short-term in nature, at 0% interest, with the intent to pay the monies back as soon as the Langston entities were in a financial position to do so.

14.    But even if there was not actual "lending of money" between Ola and the Langston business entities, it appears that the payments made between Ola and the Langston entities were nevertheless "prohibited transactions" as transfers "to, or use by or for the benefit of, a disqualified person of the income or assets of a plan."

### (2)    *Were the payments to and from Ola and the Langston Entities Transfers for the benefit of a Disqualified Person?*

15.    As mentioned above, 26 U.S.C. § 4975(c)(1)(D) provides that the following is a prohibited transaction: "a transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan."

16.    This court posed questions to the witnesses and the parties' lawyers regarding the distinction between "transfers" and mere "distributions" to a plan beneficiary. Upon initial review, the terms "distribution" and "transfer" appear to be close to interchangeable, with the word "transfer" likely encompassing a broader scope than merely a distribution. However, the focus of section 4975(c) of the Internal Revenue Code is not on the characterization of ***transfer*** versus ***distribution***; rather, ***the key question is if the recipient of assets or income of the plan is a "disqualified person."*** Indeed, whether the funds-flows were "lending" or "transfers," the recipient of the funds must be a "disqualified person" for the transaction to become "prohibited."

---

[48] Fed. R. Bankr. Proc. 4003(c).

17.     Essentially, whether a transaction is a prohibited transaction hinges on (a) whether the transaction is between an IRA plan and a "*disqualified person*," and (b) if so, whether the transaction might nevertheless be saved by virtue of one of the exemptions (i.e., exclusions/exceptions) set forth in section 4975(d) of the Internal Revenue Code.

18.     The Internal Revenue Code defines a "disqualified person" in section 4975(e)(2) as the following:

(A) a *fiduciary*;

(B) a person providing services to the plan;

(C) an employer any of whose employees are covered by the plan;

(D) an employee organization any of whose members are covered by the plan;

(E) an owner, direct or indirect, of 50 percent or more of—
(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,
(ii) the capital interest or the profits interest of a partnership, or
(iii) the beneficial interest of a trust or unincorporated enterprise, which is an employer or an employee organization described in subparagraph (C) or (D);

(F) *a member of the family* (as defined in paragraph 6)) *of any individual described in subparagraph (A)*, (B), (C) or (E);

(G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of—
(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,
(ii) the capital interest or profits interest of such partnership, or
(iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);

(H) an officer, director (or an individual having powers or responsibilities similar to those of officers or directors), a 10 percent or more shareholder, or a highly compensated employee (earning 10 percent or more of the yearly wages of an employer) of a person described in subparagraph (C), (D), (E), or (G); or

(I) a 10 percent or more (in capital or profits) partner or joint venturer of a person described in subparagraph (C), (D), (E), or (G).

16

19.     A "fiduciary" is defined in section 4975(e)(3) as any person who –

(A) *exercises any discretionary authority or discretionary control respecting management of such plan* or exercises any authority or control respecting management or disposition of its assets,

(B) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(C) has any discretionary authority or discretionary responsibility in the administration of such plan.

20.     Based on an IRA owner's definitional discretionary authority to direct the investments of a self-directed IRA, *the IRS considers IRA owners and managers to be fiduciaries* with respect to self-directed IRAs.[49]

21.     Ola is comprised of the three self-directed IRAs of the Debtor and Debtor's Spouse. The Debtor is the beneficiary and sole manager of Ola and testified that he alone makes all the investment decisions for these accounts.[50] Thus, *as beneficiary and director of both his IRAs and his wife's IRA, the Debtor is a fiduciary of the IRAs* in question here. As a fiduciary*, the Debtor falls within the definition of a "disqualified person*."

22.     Indeed, the CPA witness put forward by the Debtor informed the court that "for our purposes, [the] disqualified person[s] of interest would be [the Debtor], his wife, and his daughter."[51]

23.     It is undisputed that multiple payments were made from Ola to both *Langston LP* and *Langston Investments, Inc*. The ownership of both these two entities is allocated among

---

[49] *Retirement Topics – Prohibited Transactions*, INTERNAL REVENUE SERVICE (Apr. 12, 2023), <u>Retirement Topics - Prohibited Transactions | Internal Revenue Service (irs.gov)</u>.
[50] Doc. 115, Hearing Transcript – February 27, 41:5-10.
[51] Doc. 115, Hearing Transcript – February 27, 142:3-5.

the Debtor, his wife, and their daughter.  The Debtor then used the funds transferred to the Langston LP and Langston Investments, Inc. for both business expenses (which inured to his benefit—as he and his family members were owners) and for his own personal expenses (which inured to his benefit).[52] Transfers were made sporadically back to Ola from both the Langston entities.[53]

24.     As stated above, the Internal Revenue Code sets forth the general rules about the types of payments that constitute prohibited transactions with a disqualified person like the Debtor. A "prohibited transaction" includes "any direct or indirect . . . transfer to, use by or for the benefit of, a disqualified person of the income or assets of a plan."[54] Also within the scope of prohibited transactions is any "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account" or the "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing the plan in connection with a transaction involving the income or assets of the plan."[55]

25.     The Debtor repeatedly transferred money from Ola to entities over which he had ownership and control, then used the checking accounts of those entities for his personal benefit, i.e., paying personal expenditures and bills as well as purchasing gifts for his family. Several courts have held this type of self-dealing between a fiduciary and an IRA constitutes a prohibited transaction under the Internal Revenue Code.[56]

---

[52] The Debtor paid real estate taxes, utility bills, credit card bills and other expenses out of both Langston entities' accounts. *See* Doc. 115, Hearing Transcript – February 27, 78:1-24.

[53] Doc. 115, Hearing Transcript – February 27, 79:4-13.

[54] 26 U.S.C. § 4975(c)(1)(D).

[55] 26 U.S.C. § 4975(c)(1)(E) and (F).

[56] See *Harris v. Comm'r*, 67 T.C. Memo 1994-22 (1994) (use of IRA funds to purchase real property for use as IRA Owner's personal residence was a prohibited transaction under § 4975(c)(1)(D) based on benefit to disqualified person in the form of personal use of IRA asset); see also *In re Kellerman*, 538 B.R. 776 (E.D. Ark. 2015) (transfer from a partnership owned 50% by an IRA to an LLC owned 50% by the IRA Owner was a prohibited transaction

26.    The Eleventh Circuit faced a similar situation in the *In re Yerian* case.[57] There, the

debtor had established an IRA but then treated the money in it as his own, using it to buy a

condominium, purchase cars, and make car repairs. The court held (and the debtor in *Yerian* did

not contest) that such actions were clearly prohibited transactions under the Internal Revenue

Code. The debtor nonetheless claimed his IRA exemption was not affected. Upon review, the

appellate court upheld the bankruptcy court's determination that, as a result of these self-dealing

transactions, the IRA had not been maintained in accordance with the IRA's governing

instrument, which in turn mandated compliance with the Internal Revenue Code and, thus, the

debtor had forfeited its creditor-exempt status.[58]

27.    In the present case, to recap:  (a) the Debtor's IRAs:  the Debtor owns self-directed

IRAs; (b) Ola:  the Debtors' IRAs and the Debtor's Spouse's IRA are each held through Ola

(i.e., Ola's sole members are the Three IRAs); (c) Langston LP:  The Debtor transacted his oil

and gas investments business through Langston LP, which was 40% owned by Debtor, 40%

owned by the Debtor's Spouse, and 20% owned by the Debtor's daughter (neither the Debtor's

Spouse nor daughter worked at Langston LP);[59] (d) Langston Investments, Inc.:  The Debtor

also transacted business through Langston Investments, Inc., starting in April 2018, and the

Debtor previously owned 50% of Langston Investments, Inc. and Langston LP owned 50% of

---

regardless of whether construed as a loan or a capital contribution, based on the benefit to the IRA Owners of the
enhanced value of their equity interest in the LLC).

[57] *In re Yerian*, 927 F.3d. 1223 (11th Cir. 2019).

[58] *Id*. at 1231; note that the debtor in *Yerian* was a Florida resident and Florida is an opt-out state.  Under Fla. Stat. §
222.21(2)(a)(2), the question of exempt status for an IRA technically turns on whether or not it had been maintained
in accordance with the IRA's governing instrument, rather than in compliance with the Internal Revenue Code.
However, the IRA's governing instrument forbade the IRA owner to engage in the same prohibited transactions laid
out in the Internal Revenue Code. Thus, by extension, the court's analysis of whether the IRA was in compliance
with its governing instrument is essentially synonymous with an analysis of whether the IRA was in compliance
with the Internal Revenue Code.

[59] As noted earlier, according to tax returns submitted into evidence, Langston LP was owned 40% by the Debtor,
40% by the Debtor's Spouse, and 20% by their daughter.  Creditor Exh. 38 (tax returns for Langston, LP).
According to the original limited partnership agreement submitted into evidence, Langston LP was owned 46.5% by
the Debtor, 45.5% by the Debtor's Spouse, and 8% by their daughter.  Creditor Exh. 46, Sec. 4.1.

Langston Investments Inc., but in March 2018, the ownership allocation was changed to 19% owned by Debtor; 1% by Langston, LP; 40% by Debtor's Spouse; and 40% by Debtor's daughter.[60] The Debtor is the manager of each of Ola, Langston LP, and Langston Investments, Inc. Ola, comprised of funds from the Three IRAs, sent funds to Langston LP and Langston Investments (sometimes through Langston LP and sometimes directly), numerous times between 2015 and 2019. Thus, the IRA funds were used to directly benefit entities in which the Debtor had a significant personal equity ownership interest. In turn, the Langston LP's and Langston Investments' checking accounts were also used freely for the benefit of the Debtor.

28.    A question about which one might wonder here is whether **Langston LP** and **Langston Investments, Inc.** were themselves "disqualified persons" or were only the Debtor, the Debtor's Spouse and daughter (and might this matter)?

29.    Notably, 26 U.S.C. § 4975(e)(5), applies constructive ownership rules with regard to partnerships in determining whether the 50% threshold in section 4975(e)(2)(G) has been reached. Recall that section 4975(e)(2)(G) provides that a "disqualified person" includes a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of the capital interest or profits interest of such entity is owned directly or indirectly or held by persons who otherwise qualify as a "disqualified person," pursuant to section 4975(e)(2) subparagraphs (A), (B), (C), (D), or (E).

30.    Thus, Langston LP itself would appear to be a "disqualified person" since it was owned at least 50% by disqualified persons (i.e., Langston LP was owned 100% by three disqualified persons: the Debtor, Debtor's Spouse, and Debtor's daughter).

---

[60] Doc. 126, Hearing Transcript – April 26, 56: 20-21; 137:20-23; Doc. 115, Hearing Transcript – February 27, 15:1-13; 41:2-4; 70:17-72:11. *See also* Debtor Exh. A (Schedule A/B, Q. 19).

31.    But even without this "constructive ownership" concept in section 4975(e)(5), it would appear that it is really of no consequence that the transfers went to Langston LP and Langston Investments, Inc. (as opposed to directly to the Debtor, the Debtor's spouse or the Debtor's daughter) since the transfers clearly were all *for the benefit of the Debtor*—and being for the benefit of a "disqualified person" is all that really matters. Given the plain text of 26 U.S.C. § 4975(c) and its interpretation by courts presented with similar situations, the Debtor's movement of money from Ola to the Langston entities clearly constitute "transfer[s] to, use by or for the benefit of, a disqualified person of the income or assets of a plan."[61] Alternatively, such transfers would also fall within the bucket of an "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."[62] Consequently, *the monies moved between Ola and the Langston entities are prohibited transactions under the Internal Revenue Code.*

32.    But there is one more thing to consider: despite being "prohibited transactions" to or for the benefit of "disqualified persons," did these transactions fall into one of the statutory exemptions (i.e., exceptions) laid out in section 4975(d) of the Internal Revenue Code?

33.    Section 4975(d) provides a laundry list of exemptions or exceptions to what would otherwise be prohibited transactions. Generally speaking, section 4975(c)'s "prohibited transactions" are so broad that they might "effectively prohibit many transactions that the [IRA] would normally engage in, shifting the burden to fiduciaries and disqualified persons to show that the exemptions (statutory or administrative) permit such transactions."[63] The prohibited transactions are meant to be a safeguard, as "the purpose of section 4975, in part, is to prevent

---

[61] 26 U.S.C. § 4975(c)(1)(D).
[62] 26 U.S.C. § 4975(c)(1)(E).
[63] Kathryn Kennedy, *BNA Tax Management Portfolio* 367 (3d ed. 2013).

taxpayers involved in a qualified retirement plan from using the plan to engage in transactions for their own account that could place plan assets and income at risk..."[64] However, Congress apparently realized that such strict prohibitions may inhibit normal IRA transactions, so they created certain exemptions/exceptions for what might otherwise be a prohibited transaction.

34.    Only one of these exemptions/exceptions is potentially applicable here: section 4975(d)(9), which provides that the prohibited transaction rules do not apply to *"receipt by a disqualified person of any benefit to which he may be entitled as a participant or beneficiary in the plan, so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries."*[65]

35.    The problem here seems to lie in the last clause of this exemption: "*so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries.*"  Here, it is undeniable that the Debtor is both a "disqualified person" and a plan participant/beneficiary.  So, at first blush, it might seem as though the loans/transfers to the Langston entities were "no big deal," if the Debtor was entitled to take funds out of the IRAs personally (as a plan participant) anyway.  But here, there was no "comput[ing]" and "pa[ying]" of the transfers on a basis which was "*consistent with the terms of the plan* as applied to all other participants" (the only other participant being the Debtor's wife).  This clause has to mean something.  It seems to suggest some structure or regularity (as opposed to willy-nilly transfers in and out of Ola whenever) but, more pointedly, it requires *consistency with the terms of the plan*.

36.    Looking to the terms of plan (i.e., the Ola Operating Agreement), several things stand out.  First, the plan terms (i.e., Ola operating agreement) *prohibit lending* (unless in

---

[64] *Ellis v. C.I.R.,* T.C. Memo 2013-245, 106 T.C.M. (CCH) 468 (T.C. 2013), *aff'd*, 787 F.3d 1213 (8th Cir. 2015).
[65] 26 U.S.C. § 4975(d)(9).

accordance with section 4975(d) of the Internal Revenue Code[66]—which would ***not*** apply here since section 4975(d) prohibits a loan to a disqualified person unless, among other things, the loan is "adequately secured" (and the loans here—if that's what the transfers to the Langston entities were—were not secured).    Second, the plan terms required all distributions and contributions to Ola being made through "***the custodian***" (which was defined as IRA Services Trust Company, later replaced with Forge Trust)."[67]    The evidence reflected that it was the Debtor who was disbursing out all the funds-flow to the Langston entities—not the custodian.[68] While the Debtor, as manager, could manage the funds in the IRAs, he did not have authority to make distributions.    And as to the contributions, while the evidence suggests that those were typically made to the custodian,[69] the plan terms required that additional contributions to Ola (after the initial capital contributions) could only be made "when accompanied by a licensed attorney's Opinion Letter citing authority" in support for it.[70]    There was no evidence that any such Opinion Letters were ever obtained.    Thus, this court cannot conclude that the exemption/exclusion of section 4975(d)(9) of the Internal Revenue Code applies here.

37.    As a result, the monies in question constitute "prohibited transactions" under the Internal Revenue Code.

*(3) Significance of the Debtor Being Over Age 59½ at the Time of the Transfers*

38.    At both the Trial and in his post-trial brief, the Debtor argued vehemently that because he was over 59½ at all relevant times, he could not be a disqualified person within the

---

[66] Debtor's Exh. E, at p. 11 (Appendix A).
[67] *Id.* at p. 3 (section 7.c). The Ola Operating Agreement states in relevant part: "The Limited Liability Company may make distributions of capital only through the custodian."  However, no custodian was involved in the transfers—all of the checks drawn on Ola to the Langston LP were signed by the Debtor. *See* Debtor's Exhs. F-P.
[68] *Id.*
[69] *See, e.g.,* Debtor Exhs. Q-T.
[70] Debtor's Exh. E, at p. 3 (section 7).

meaning of the Internal Revenue Code and was entitled to take any distribution he wished without consequence.

39.     To start, it bears mention that the court asked this question to the CPA witness directly at Trial hearing and he was unable to confirm the Debtor's position.[71] In addition, the definition of "disqualified person" in 26 U.S.C. § 4975(e)(2) makes no reference to age whatsoever.  Nor does 26 U.S.C. § 4975(c) in its list of "prohibited transactions."  Presumably, if reaching age 59½ negated all of the provisions dealing with "disqualified persons" and "prohibited transactions," the statute would reflect this. Of course, once the IRA owner has reached age 59½, there is no additional tax (or penalty) imposed on otherwise permissible distributions, but that appears to be the only relevance of reaching age 59½.[72]

40.     There is also no exemption/exclusion in 26 U.S.C. § 4975(d) to the definition of "prohibited transaction" for transactions involving an otherwise disqualified person who is 59½ years old or older, and there is no basis for reading such an exemption into the statute. Had Congress intended to create such an exemption/exclusion, it could have easily done so.

41.     To support his position that his age is the key determining factor in whether these payments were allowable, the Debtor points to *In re Chaudury*, in which the bankruptcy court for the Middle District of Tennessee reviewed the actions of a debtor, above the age of 59½, who used money from his IRA for interim funding to buy a house before the home mortgage was put into place.[73] The bankruptcy trustee in *Chaudury* argued that this was a prohibited transaction sufficient to destroy the IRA's exempt status. The Tennessee bankruptcy court noted that because of his age, the debtor was entitled to take any distribution from his IRA that he wished – it is this language

---

[71] Doc. 115, Hearing Transcript – February 27, 132:10-25.
[72] *See* 26 U.S.C. § 72(t)(2)(A)(i).
[73] *In re Chaudury*, 581 BR. 279 (Bankr. M.D. Tenn. 2018).

that the Debtor clings to in his post-trial brief. However, ***the question is not whether an IRA owner above the age of 59½ may take any distribution they wish; it is whether they may freely transfer money into and out of his IRA for personal and business use without consequence to the IRA's exempt status.***

42.    Interestingly, the Internal Revenue Code ***does*** provide a method by which IRA owners may remove funds from their IRA for personal use and then replace them without destroying the IRA's tax-exempt status: ***the 60-day rollover***.[74]

43.    Section 522(b)(4) of the Bankruptcy Code directs how exemption law applies when there is a "rollover distribution" where the owner of an IRA receives a distribution and then places the money in a new IRA, or returns the money to the old IRA, within 60 days. Once again, the Bankruptcy Code defaults to the Internal Revenue Code in defining what is a proper transaction: if the transaction does not cause the IRA to lose its favorable tax treatment, then it likewise retains its favorable exemption status.[75]

44.    26 U.S.C. § 408(d)(3) details how a "Rollover Contribution" must be handled. The subsections of that provision establish the requirement that the rollover must occur within 60 days after the money is paid out, that the money must go back into an eligible retirement plan, and that the rollover can take place no more than once per year.

45.    11 U.S.C. § 522(b)(4)(D) provides that if there is a distribution "from a fund or account that is exempt" that is then "deposited in such a fund or account" within 60 days of the withdrawal, the money does not lose its exempt status.

---

[74] The court believes it bears noting that this issue was not mentioned in either party's pleadings, post-trial briefs, or at Trial (not even by the CPA witness).

[75] *See* 11 U.S.C. § 522(b)(4)(D)(i) ("Any distribution that qualifies as an eligible rollover distribution within the meaning of section 402(c) of the Internal Revenue Code of 1986 or that is described in clause (ii) shall not cease to qualify for exemption under paragraph (3)(C) or subsection (d)(12) by reason of such distribution").

46.    In the *Chaudury* case, the bankruptcy court determined that because the debtor had complied with the requirements of the 60-day rollover, his IRA did not lose its creditor-exempt status. The case at bar presents a completely different situation than the one at issue before the Tennessee bankruptcy court: the Debtor in the present case made multiple transfers to and from his IRAs in Ola at various intervals over a period of several years, whenever he so wished. This is *not* a scenario where an unexpected emergency or other life need arose, the Debtor withdrew a specific amount from his IRA, and then returned it within 60 days.

47.    The detailed rollover analysis performed by the Tennessee bankruptcy court further demonstrates that the age of the IRA owner is ***not*** the determining factor in whether or not transfers for the benefit of a disqualified person are prohibited under the Internal Revenue Code**. *Indeed, if, as the Debtor argues, the age of the IRA owner was all that mattered, the court in Chaudury would have had no need to perform the rollover analysis.*** The fact that the debtor in *Chaudury* was over the age of 59½ would have been the sole reason for the court to note in making its decision that the IRA retained its exempt status. As a result, there is no basis for the court to conclude here that the Debtor and his wife being above the age of 59½ at all relevant times negates the fact that the transfers to and from Ola and the Langston entities were prohibited transactions under the Internal Revenue Code. Therefore, ***the court holds that these transfers did in fact constitute prohibited transactions within the meaning of 26 U.S.C. § 4975(c)***.

48.    Section 408(e)(2) of the Internal Revenue Code provides that the consequence of engaging in a prohibited transaction is that the account ceases to be an IRA as of the first day of such taxable year. Under section 522(b)(3)(C) of the Bankruptcy Code, retirement funds are only exempt from creditors to the extent that they are exempt from taxation.[76] As the Debtor here

---

[76]After the Trial, this court initially had concerns about potential comingling of funds and the subsequent consequences under the Internal Revenue Code. In essence, the court questioned whether, even if the transactions in

repeatedly engaged in prohibited transactions, transferring money to and from Ola and the Langston entities in a manner sufficient to lose Ola's tax-exempt status under the Internal Revenue Code, *the Debtor's IRAs pooled in Ola have also ceased to be exempt from creditors under section 522(b)(3)(C) of the Bankruptcy Code.*

49.     Thus, the funds contained in Ola's accounts from the Debtor's IRAs constitute property of the bankruptcy estate subject to turnover.[77]

### IV.     CONCLUSION.

Because the transfers described above constituted "prohibited transactions" under 26 U.S.C. §4975, the Debtor has effectively forfeited his exemptions concerning the funds in the Debtor's IRAs contained in the Ola accounts.

For the above reasons, this court:

(A) sustains Dallas Commodity's objections to the Debtor's claim of exemption for the Debtor's IRAs contained in the Ola accounts;

(B) declares that all sums in Ola's account(s) from the Debtor's IRAs constitute property of the bankruptcy estate;

---

question were not prohibited transactions, the commingling of the funds in both the Debtor's and his wife's IRAs implicated the Internal Revenue Code so as to cause the IRAs to lose their exempt status, given that 26 U.S.C. § 408(a)(5) sets forth a requirement for an IRA to keep its tax-exempt status that "the assets of the trust will not be commingled with other property except in a common trust fund or common investment fund." However, the Debtor testified that the funds for the IRAs were all sent to the trustee who simply kept them in a common fund, and Dallas Commodity does not dispute this. There is also very little case law on this issue. In a non-precedential Private Letter Ruling, the IRS concluded that rolling over lump sums from two separate plans into one IRA would "not violate the prohibition against commingling contained in" Section 408(a)(5) (*see* PLR 7828033 (1978)). In addition, given the funds in Ola have lost their exempt status on independent grounds as a result of prohibited transactions, the court does not feel the need to reach this issue.

[77] Additionally, the court also questioned whether, if the IRAs in question had not lost their exempt status through either prohibited transactions or comingling of funds, the "excess contributions" that the Debtor testified to making to Ola would nevertheless be reachable by creditors. Although Texas Property Code Sec. 42.0021 exempts a "qualified savings plan" (which includes both traditional IRAs and Roth IRAs) from creditors generally, to the extent the plan or account is exempt from federal income tax, contributions to a qualified savings plan that are "*excess contributions*" under Section 4973, Internal Revenue Code of 1986, and any accrued earnings on such contributions are **not** exempt under this section unless otherwise exempt by law. However, since **all** the funds in the Ola IRAs are non-exempt due to the Debtor's prohibited transactions, the court again does not need to reach this issue.

(C) orders the Debtor to account for and turn over to the Bankruptcy Trustee all sums

from the Debtor's IRAs which were in Ola's account(s) when the Debtor filed

bankruptcy, inclusive of all such sums which have been withdrawn from said

account(s) since the Debtor filed bankruptcy.

All relief requested by the Debtor is denied.

All relief not expressly granted herein is denied.[78]

**IT IS SO ORDERED.**

### ### END OF MEMORANDUM OPINION AND ORDER ###

---

[78] Dallas Commodity had also objected to the Debtor's claimed exemption of the earned and contingent commissions due to the Debtor by Langston Investments, as well as the Debtor's signature authority for Ola. However, neither of these objections were featured in the relief requested by Dallas Commodity in its Amended Objection [Doc. 86]. In addition, other than counsel for Dallas Commodity mentioning briefly its objection to the commissions and signature authority during opening statements for the Trial, there was no mention of either during the Trial. Therefore, the court does not order any relief with regard to either of these objections.